O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAROL L. SHIPLEY,                )
                                 )   Case No. CV 06-7737-JCR
            Plaintiff,           )
                                 )
        vs.                      )   MEMORANDUM OPINION
                                 )   AND ORDER
MICHAEL J. ASTRUE,[1]            )
Commissioner of the Social       )
Security Administration,         )
                                 )
            Defendant.           )
_____ )

Carol L. Shipley ("Plaintiff") seeks review of the decision of Michael J. Astrue ("Defendant" or "Commissioner"), the Commissioner of the Social Security Administration, denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. As discussed below, this

_____

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of the Social Security Administration. Thus, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart. *See* Fed. R. Civ. P. 25(d).

Court[2] affirms the decision of the Commissioner.

## I.    PROCEEDINGS

Plaintiff filed a Complaint on December 20, 2006, seeking review of the Defendant's denial of her application for DIB and SSI benefits.  On July 24, 2007, Defendant filed the certified Administrative Record ("AR") and an Answer.  On September 17, 2007, the parties filed a Joint Stipulation ("JS") in accordance with the Court's Case Management Order.  Thus, this matter is now ready for decision.

As the Court advised the parties in its Case Management Order, the decision in this case will be made based on the pleadings, the AR, and the JS filed by the parties.  In accordance with Federal Rule of Civil Procedure 12(c), the Court will determine which party is entitled to judgment under the standards set forth in 42 U.S.C. § 405(g).

This Memorandum Opinion and Order shall constitute the Court's findings of fact and conclusions of law.

## II.    BACKGROUND

On October 31, 2002, Plaintiff filed an application for DIB and SSI benefits.[3]  (AR at 66-68.)  The application was denied initially on January 21, 2003.  (*Id.* at 30-34).  On March 31, 2004,[4] and August 16, 2004, hearings were held, as a result of which Administrative Law Judge Lawrence T. Wheeler ("ALJ")

---

[2]  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the Magistrate Judge conducting any and all proceedings in the instant matter and ordering the entry of final judgment.

[3]  The AR does not contain the SSI application.

[4]  At the hearing on March 31, 2004, the ALJ continued the hearing pending receipt of medical records that could substantiate Plaintiff's testimony.

2

1    issued a decision unfavorable to Plaintiff.  (*Id*. at 20, 995-1009, 1010-41.)

2         As reflected in his November 26, 2004, hearing decision, the ALJ found that
3    Plaintiff's "polysubstance dependence [met] the criteria set forth under Listing
4    12.09 of Appendix 2 to Subpart P of the Regulations." (*Id*. at 24.)  The ALJ
5    further found that in the absence of drug and alcohol abuse, Plaintiff "[had] no
6    more than mild limitations in her ability to maintain normal activities of daily
7    living and in her ability to maintain adequate levels of concentration, persistence,
8    and pace[,] and [had only] moderate limitations in her ability to maintain adequate
9    levels of social functioning." (*Id*.)  But for drug abuse and alcoholism, the ALJ
10   found that Plaintiff retained the residual functional capacity ("RFC") to "perform
11   medium level work that does not require contact with the public, more than simple
12   tasks, more than occasional postural activities, and/or more than moderate
13   exposure to extremes of temperature, gases, dusts, fumes, and hazards." (*Id*.)
14   Based on the RFC determination and the VE's testimony, the ALJ concluded
15   Plaintiff was not entitled to disability benefits, and was not eligible for SSI.  (*Id*. at
16   25.)

17        On January 4, 2005, Plaintiff filed a Request for Review of Hearing
18   Decision with the Appeals Council.  (*Id*. at 15-17.)  On October 6, 2006, the
19   Appeals Council denied review, thereby making the decision of the ALJ the final
20   decision of Defendant in this matter.  (*Id*. at 6-10.)

21        On December 20, 2006, Plaintiff timely filed the instant action, seeking
22   judicial review of the denial of benefits by Defendant.

23

24   **III.   DISPUTED ISSUES**

25        Plaintiff raises the following grounds for reversal and/or remand:

26        1.    Whether the ALJ properly considered the opinions of the state
27              agency physician; and

28        2.    Whether the ALJ properly considered the treating source

1    opinions.

2  (JS at 3-4.)

3

4  **IV.    STANDARD OF REVIEW**

5          Under 42 U.S.C. § 405(g), this Court reviews the Defendant's decision to

6  determine whether the Defendant's findings are supported by substantial evidence

7  and whether the proper legal standards were applied.  *DeLorme v. Sullivan*, 924

8  F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere

9  scintilla" but "less than a preponderance."  *Richardson v. Perales*, 402 U.S. 389,

10  401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76

11  (9th Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable

12  mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

13  401 (citation omitted).

14          The Court must review the record as a whole and consider adverse as well as

15  supporting evidence.  *Green v. Heckler*, 803 F.2d 528, 530 (9th Cir. 1986).  Where

16  evidence is susceptible of more than one rational interpretation, the Defendant's

17  decision must be upheld.  *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

18

19  **V.    DISCUSSION**

20      **A.    The ALJ Properly Considered the Opinions of the Examining**

21          **State Agency Physician**

22          Plaintiff contends that the ALJ ignored the opinion of Dr. C. H. Dudley, an

23  examining state agency physician, and failed to incorporate Dr. Dudley's findings

24  into the ALJ's hypothetical question to the VE.  (JS at 5, 10, 11.)

25          **1.    Dr. Dudley's Findings**

26          In January 2003, Dr. Dudley completed two forms: a Mental RFC

27  Assessment form ("RFC Form") (AR at 163-66), and a Psychiatric Review

28  Technique form ("PRTF") (*id*. at 175-88).

4

1     In the section entitled Summary Conclusions on the RFC Form, Dr. Dudley

2  found that, as to "Understanding and Memory," Plaintiff was not significantly

3  limited in her ability to remember locations and work-like procedures, or in her

4  ability to understand and remember short and simple instructions.  (*Id.* at 163.)

5  However, he did find that Plaintiff was moderately limited in her ability to

6  understand and remember detailed instructions.  (*Id.*)  In the category of "Sustained

7  Concentration and Persistence," Dr. Dudley found that Plaintiff was not

8  significantly limited in this category, except as to the ability to carry out detailed

9  instructions.  (*Id.* at 163-164.)  In the category of "Social Interaction," Dr. Dudley

10 found that Plaintiff was not significantly limited in this category except as to the

11 ability to interact appropriately with the general public, but could ask simple

12 questions, accept instructions, respond appropriately to criticism, get along with

13 coworkers, and maintain socially appropriate behavior.  (*Id.* at 164.)  In the

14 category of "Adaptation," Dr. Dudley found that Plaintiff was not significantly

15 limited.  (*Id.*)  Finally, Dr. Dudley elaborated on Plaintiff's functional capacity by

16 stating that Plaintiff "would be able to understand, remember, and follow simple

17 instructions; would be able to maintain concentration on simple work[;] would be

18 able to interact appropriately with peers and supervisors[,] but would have

19 moderate difficulty with the public."  (*Id.* at 165.)

20     In the PRTF completed on January 21, 2003, Dr. Dudley indicated that

21 Plaintiff suffered from "12.04 Affective Disorders," specifically Depressive

22 Disorder.  (*Id.* at 178.)  Under the categories of "restrictions of activities of daily

23 living" and "difficulties in maintaining concentration, persistence, or pace," Dr.

24 Dudley found that Plaintiff had only a mild degree of limitation, but had moderate

25 limitations in maintaining social functioning.  (*Id.* at 185.)  Dr. Dudley also noted

26 that Plaintiff had a "sad/downcast affect," with no evidence of paranoia, delusions,

27 or suicidal or homicidal ideations; was "linear and goal directed" as well as alert;

28 and had good insight and judgment.  (*Id.* at 187.)

### 2.   Analysis

#### a.   The ALJ properly considered Dr. Dudley's opinions

Plaintiff contends that the ALJ disregarded Dr. Dudley's opinion concerning "the presence of moderate impairments in the [Plaintiff's] ability to engage in the mental requirements of detailed work tasks" on the RFC Form.  (JS at 5; AR at 163-64.)  As stated above, the RFC Form completed by Dr. Dudley  indicated moderately limited ability to understand, remember, and carry out detailed instructions, as well as moderately limited ability to interact appropriately with the general public ("Summary Conclusions").  (AR at 163-64.)

The Ninth Circuit distinguishes among the opinions of three types of physicians:

> (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (footnote omitted).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  *Id.*  The ALJ may reject an uncontroverted opinion of an examining physician only for clear and convincing reasons.  *See Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  The "opinion of a nonexamining physician *cannot* by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  *Id.* at 831 (emphasis added).

Here, the ALJ did not reject the findings of Dr. Dudley, an examining physician.  Although the ALJ does not specifically reference Dr. Dudley's

Summary Conclusions, the ALJ did adopt Dr. Dudley's findings of functional limitations stated on the PRTF, as evidenced by the ALJ's following findings:

> But for drug abuse and alcoholism, however, [Plaintiff] has no more than mild limitations in her ability to maintain normal activities of daily living and in her ability to maintain adequate levels of concentration, persistence, and pace and moderate limitations in her ability to maintain adequate levels of social functioning.

(AR at 24, 185.)

Furthermore, the ALJ's findings were consistent with Dr. Dudley's conclusion that Plaintiff could perform simple work with limited public contact. Specifically, the ALJ, in citing to the findings of the examining medical consultant, Dr. Barry Edelman, noted that "[Plaintiff]'s depression only restricted her to the performance of simple work that did not require much contact with the public." (*Id.* at 23.)

On December 27, 2002, Dr. Edelman performed a complete psychiatric evaluation of Plaintiff. (AR at 157-162.) As a result of the evaluation, he diagnosed Plaintiff with Depressive Disorder and Polysubstance Abuse, in early remission. (*Id.* at 161.) As to Plaintiff's prognosis and functional ability, he indicated as follows:

> The claimant would be able to understand, remember, and follow simple instructions. The claimant would have difficulty understanding, remembering and following complex instructions, given her report of her overall activities of daily living with respect to cognition in conjunction with her performance on the mental status exam. The claimant would be able to maintain concentration on simple work. The claimant would be able

1   to maintain adequate pace doing simple work from a
2   psychiatric perspective.  The claimant would be able to
3   interact sufficiently with peers and supervisors.  The
4   claimant would have moderate difficulty interacting with
5   the public based on the claimant's relatedness during this
6   interview, as described in the Mood and Affect section in
7   the mental status exam.

8   The prognosis for this claimant from a psychiatric
9   perspective is fair, assuming the claimant would be doing
10   simple work that would not require much contact with the
11   public.  It also should be noted the claimant could benefit
12   from receiving an antidepressant.

13   (*Id.*)

14   Thus, Dr. Edelman's findings, as specified by the ALJ in his decision, are
15   entirely consistent with those of Dr. Dudley's in that both physicians conclude
16   Plaintiff should be limited to "simple instructions" and have little contact with the
17   public.  (*See id.* at 161, 165.)

18   Finally, the ALJ is not required to consider and refer to every finding of
19   every physician from whom Plaintiff sought treatment.  "In interpreting the
20   evidence and developing the record, the ALJ does not need to discuss every piece
21   of evidence."  *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir.
22   2003).  Rather, the ALJ need only discuss significant, probative evidence.  *Vincent*
23   *v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984).

24   Accordingly, the Court finds "substantial evidence" to support the
25   conclusion that the ALJ properly considered Dr. Dudley's Summary Conclusions
26   and opinions.

27
28

8

b.   The ALJ properly inquired of the vocational expert

Plaintiff next argues that the ALJ did not inquire about the classification of work identified by the vocational expert ("VE"), and did not request of the VE a numerical identifier from the Dictionary of Occupational Titles ("DOT") for each job.  (JS at 8.)  Plaintiff also argues that because Dr. Dudley indicated Plaintiff had moderately limited abilities as to detailed instructions, Plaintiff could not perform a job with reasoning development of Level 2, but rather is restricted to a job with reasoning development of Level 1.[5]  (*Id*.)

As to specifying work classifications or DOT numerical identifiers, the Social Security rulings do not require that the ALJ ask VEs to specify such items.  *See* Soc. Sec. Ruling ("SSR") 00-4p.  All that is required is that the ALJ determine whether the VE's testimony deviates from the DOT and if so, whether there is a reasonable explanation for the deviation.  *Id.; see also Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  As will be discussed, *infra*, on pages 12-13, there is no conflict between the VE's testimony and the DOT.  Accordingly, the ALJ did not err in failing to inquire about classification of work and the DOT numerical identifier.

As to Plaintiff's argument regarding reasoning development, the Court finds that the Plaintiff was not restricted to a job with reasoning development Level 1.

---

[5]  Reasoning development Level 1 only requires that the worker be able to "apply commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables."  U.S. Dep't of Labor, *Dictionary of Occupational Titles* App. C. (4th ed. rev. 1991). Reasoning development Level 2, on the other hand, indicates that the job requires a person to be able to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations."  *Id.*

A job's reasoning level, or reasoning development,[6] "gauges the minimal ability a worker needs to complete the job's tasks themselves." *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005).  Reasoning development is one of three divisions comprising the General Educational Development ("GED")[7] Scale.  U.S. Dep't of Labor, *Dictionary of Occupational Titles* App. C. (4th ed. rev. 1991) [hereinafter DOT].   The DOT indicates that there are six levels of reasoning development. *Id.*

In this case, the ALJ asked the VE a hypothetical that included the following factors consistent with Plaintiff's background:

> High school GED education plus a year of college, the same work experience [Plaintiff] had.  Limitations are . . . medium.  Non-exertionally [sic] . . . work should [involve] no public . . . contact . . . .  *Simple instructions* due to mental [limitations] . . . .
>
> . . . .
>
> Would there be other jobs existing in significant numbers in the local or national economy that would fit [this description]?

---

[6]  "Reasoning level" and "reasoning development" are used interchangeably. Plaintiff and certain courts refer to "reasoning level," whereas the DOT refers to "reasoning development." *Compare Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005) *with* U.S. Dep't of Labor, *supra* note 5, at App. C.

[7]  The General Educational Development "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.  This is education of a general nature which does not have a recognized, fairly specific occupational objective.  Ordinarily, such education is obtained in elementary school, high school, or college.  However, it may be obtained from experience and self-study." U.S. Dep't of Labor, *supra* note 5, at App. C.

(AR at 1038 (emphasis added).)  The VE responded that there were significant jobs available to such a person who, due to mental limitations, was only capable of following "simple instructions," stating the following:

> Yes.  There would be assembly jobs . . . .  [I]n the local economy, I'd say, possibly, 600 to 1,000.  There's a lot in the auto manufacturing and such that, I think, would because of the moderate exposure issue, be eliminated . . . .  But there are some that are within this.  For example, there's a machine, automatic machine attendant in paper goods that's at medium, SVP[8] of 2 . . . , [f]actory helper in sugar and confectionery products . . . , [and] [w]ood working, auto manufacturing-type.  There would also, be some of the hand packaging types of occupations . . . .  Approximately 1,000 or so of those at medium.

(*Id.* at 1038-39.)  The ALJ arrived at a similar conclusion in his decision, stating the following:

> When posed a hypothetical question involving an individual age 51 with a general education diploma and one year of college, the same work experience set forth above, and the same residual functional capacity assessed above (medium work with no more than *simple instructions* and not requiring social contact, more than occasional postural activities, or more than moderate exposure to extremes of temperature, gases, dusts, fumes, and hazards), the

---

[8] A job's SVP, or specific vocational preparation, is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.*

vocational expert testified that such an individual would be
incapable of performing his/her past relevant semi-skilled
and skilled work, but that he/she *would be capable of
performing other work existing in significant numbers in
the local economy*.

(*Id.* at 23 (emphasis added).)

The Court finds that the DOT's reasoning development Level 2 requirement does not conflict with the ALJ's prescribed limitation that Plaintiff's work involve only simple instructions. *Meissl*, 403 F. Supp. 2d at 984-85 (finding that reasoning development Level 2 does not conflict with the ALJ's prescribed limitation that plaintiff perform simple, routine tasks); *see generally Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding that reasoning development Level 2 appears to be more consistent with plaintiff's RFC of "simple and routine work tasks").

The ALJ also has an affirmative duty to question the VE about potential conflicts between the VE's testimony and information provided in the DOT. *See* SSR 00-4p ("When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT."); *see also Massachi*, 486 F.3d at 1152 (finding that in addressing the "question [of] whether . . . an ALJ may rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the [DOT], . . . [w]e hold than [sic] an ALJ may not.") Furthermore, if there was a conflict, "the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." *Massachi*, 46 F.3d at 1153; *see also* SSR 00-4p.

Here, the ALJ did not ask the VE whether her testimony conflicted with the

DOT.  However, the Court finds that the ALJ's failure to inquire in this regard was harmless error, as there was no conflict between the VE's testimony and the DOT. *See Massachi*, 486 F.3d at 1154 n.19 (finding that failure to ask the VE regarding whether her testimony conflicted with the DOT could have been harmless error if there was no conflict, or if the vocational expert had provided sufficient support for her conclusion).  Indeed, the VE testified that there would be assembly jobs existing in significant numbers in the local and national economy, but that they would also be reduced in number because of environmental limitations.  (AR at 1038.)  The VE went on to testify that there would be a few DOT titles that would be appropriate, namely automatic machine attendant, factory helper in sugar and confectionery products, and hand packaging occupations.[9]  (*Id*. at 1039.)  As such, there is no apparent conflict between the VE testimony and the DOT.

Accordingly, the Court finds "substantial evidence" to support the conclusion that the ALJ properly questioned the VE.

**B.      The ALJ Properly Considered the Treating Source Opinions**

Plaintiff argues the ALJ failed to consider certain treating source opinions, including records submitted after the ALJ hearing.  (JS at 21-23.)

**1.      Treating Source Opinions**

On March 28, 2003, Plaintiff sought treatment at Didi Hirsch Community Mental Health Center ("Didi Hirsch"), a division of the Los Angeles County Department of Mental Health, whereby Plaintiff underwent a Crisis/Adult Initial Assessment and a psychiatric evaluation.  (AR at 288-292, 301-304.)  Dr. Martin M. Popok diagnosed Plaintiff with Major Depressive Disorder (with severe psychosis), Panic Disorder (without agrophobia), Alcohol Abuse (in early

---

[9] Although not explicitly stated, Plaintiff appears to be admitting that the jobs found by the VE involve reasoning development Level 2.  (*See* JS at 8.)  In fact, assembly jobs require that the reasoning development level be at Level 2. U.S. Dep't of Labor, *supra* note 5, § 706.687-010.

remission), and Polysubstance Dependence (in early remission).  (*Id*. at 304.)

Since May 15, 2003, Plaintiff was attending anger management and group therapy sessions at Another Way, a violence and abuse counseling center.  (*Id*. at 372, 376.)  On November 30, 2003, and August 12, 2004, Kamala White, a marriage and family therapist, indicated that she believed Plaintiff's mental health issues extended beyond chemical dependency and that Plaintiff had a severe case of Post-Traumatic Stress Disorder.  (*Id*.)

During the period from December 9-15, 2003, Plaintiff was treated at Brotman Medical Center ("Brotman") by Dr. David Ramin.  (*Id*. at 335, 348-49.)  Dr. Ramin diagnosed Plaintiff with "skin abscesses secondary to skin popping status post incision and drainage," a history of drug and alcohol abuse, and depression.  (*Id*. at 335.)

### 2.    Newly Submitted Evidence[10]

Records submitted after the administrative hearing include medical records from Brotman, the Compass House, and College Hospital of Cerritos ("College Hospital").

On October 11, 2004, Plaintiff was treated at Brotman by Dr. Robert Trichter.  (*Id.* at 596-98.)  Dr. Trichter diagnosed Plaintiff with "Major depression with psychotic features, recurrent," and noted that Plaintiff had auditory hallucinations, impaired insight and judgment, was expressing suicidal ideations, and had a global assessment of functioning ("GAF") score of 20.  (*Id.* at 597-98.)  On December 5, 2004, Dr. Trichter diagnosed Plaintiff with "Schizoaffective disorder versus major depression with psychotic features, recurrent."  (*Id.* at 757.)

---

[10]  The newly submitted evidence consists of Exhibits AC-1 through AC-7, which the Appeals Council made part of the record.  (AR at 9.)  The documents were apparently submitted by Plaintiff sometime after the administrative hearings were held.  Only the relevant exhibits will be discussed and will be collectively referred to as "Newly Submitted Evidence."

1    On December 24, 2004, Plaintiff was treated at Brotman by Dr. Leslie Paul

2 and Dr. Michael Tolwin.  (*Id.* at 478, 480.)  Dr. Paul diagnosed Plaintiff as a

3 danger to herself (*id.* at 477), and Dr. Tolwin similarly indicated that she had

4 "suicidal ideation with plan[s] to kill herself" (*id.* at 479).  Dr. Tolwin also noted

5 that Plaintiff's insight, judgment, and impulse control were impaired.  (*Id.*)  He

6 diagnosed Plaintiff with "Bipolar depression versus major depression," and gave

7 Plaintiff a GAF score of 20.  (*Id*. at 479-80.)

8    Plaintiff was also treated at the Compass House, a crisis residential treatment

9 facility, in March and April of 2005.  (*Id.* at 392.)  Plaintiff was noted as being

10 suicidal and depressed on Compass House's intake referral form.  (*Id.*)  On April

11 16, 2005, a psychiatric evaluation was performed whereby Plaintiff was diagnosed

12 with Psychotic Disorder, "likely Schizoaffective Disorder versus Major Depressive

13 Disorder with psychotic features," and given a GAF score of 25.  (*Id.* at 397.)  It

14 was noted that while Plaintiff had intermittent suicidal thoughts, she herself stated

15 that these thoughts had greatly diminished.  (*Id*.)  On April 23, 2005, Dr. Maurice

16 Welse also noted that Plaintiff was not actively suicidal.  (*Id.* at 396.)

17    On October 5, 2005, Dr. James Pratty performed a Psychiatric Evaluation

18 and Mental Status Examination of Plaintiff when she was brought into College

19 Hospital for being "acutely intoxicated on alcohol."  (*Id.* at 424.)  Dr. Pratty

20 diagnosed her with Psychosis, "probable Alcohol Induced Mood Disorder with

21 psychosis," with a history of polysubstance abuse and dependency, and gave her a

22 GAF score of 30.  (*Id*. at 425.)

23    On October 7, 2005, Dr. Pratty prepared a Psychiatric Discharge Summary

24 when Plaintiff was discharged from College Hospital.  (*Id*. at 421-23.)  He

25 diagnosed Plaintiff at discharge with "Drug-Induced Psychotic Disorder," with a

26 history of "Episodic Polysubstance Abuse (305.90)," and noted that Plaintiff's

27 GAF score had improved from a score of 30 to a score of 60.  (*Id*. at 421.)  The

28 mental status examination indicated that Plaintiff's mood was anxious, with

15

moderate range in intensity.  (*Id*. at 422.)  Dr. Pratty also noted that there was

evidence of "occasional loosening of associations and flight of ideas, but no

evidence of thought blocking."  (*Id*.)  While he noted that there was evidence of

"mild paranoid delusions and vague auditory hallucinations," the doctor found that

there was no grandiose delusions or visual hallucinations.  (*Id*.)  There was also no

evidence of any homicidal or suicidal ideations.  (*Id*.)  Finally, Dr. Pratty indicated

that Plaintiff's prognosis was good.  (*Id*. at 423.)

### 3.   Analysis

#### a.   Treating source opinions

It is well-established in the Ninth Circuit that a treating physician's opinions

are entitled to special weight, because a treating physician is employed to cure and

has a greater opportunity to know and observe the patient as an individual.

*McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  "The treating

physician's opinion is not, however, necessarily conclusive as to either a physical

condition or the ultimate issue of disability."  *Magallanes v. Bowen*, 881 F.2d 747,

751 (9th Cir. 1989) (*citing Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th

Cir. 1986)).  The weight given a treating physician's opinion depends on whether it

is supported by sufficient medical data and is consistent with other evidence in the

record.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the treating

physician's opinion is uncontroverted by another doctor, it may be rejected only

for "clear and convincing" reasons.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

1996); *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  If the treating

physician's opinion is controverted, it may be rejected only if the ALJ makes

findings setting forth specific and legitimate reasons that are based on the

substantial evidence of record.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.

2002); *Magallanes*, 881 F.2d at 751; *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.

1987).

In the ALJ's November 26, 2004, decision, he specifically noted the medical

evidence of Plaintiff's treating sources, stating as follows:

> The medical evidence documents a history of polysubstance abuse/dependence since age 9 with hospitalizations for alcohol abuse at ages 13 and 15 and with at least 22 attempts to undergo detoxification since that time (Exhibit 12F/5); . . . and treatment for major depression and a panic disorder closely intertwined with exacerbations of polysubstance abuse following the death of her husband in June 2002 and continuing thereafter until at least January 2004 (Exhibits 4F, 8F-9F, 11F-14F, 16F, 22F, and 25F).
>
> . . . .
>
> Rehabilitation notes refer to the claimant as requiring anger management and as experiencing 9 relapses within a 1-year period with respect to her attempts to undergo detoxification. The initial assessment evaluation from DiDi Hirsch Community Mental Health Center makes reference to a [GAF] score of only 35, indicating serious limitations/restrictions in all areas of mental functioning (Exhibit 12F/8). Given the claimant's marked limitations at least in her ability to maintain social functioning and in her ability to sustain functioning without experiencing repeated episodes of deterioration or deompensation [sic], each of an extended duration, the [ALJ] finds that the claimant's polysubstance dependence was of the level of severity that would meet or equal the criteria set forth under Listing 12.09 of Appendix 1 to Subpart P of the Regulations.

1  (AR at 22.)

2       Here, the ALJ considered the treating source opinions, including those of Dr.

3  Popok, Dr. Ramin, and the marriage and family therapist, Ms. White.  The ALJ

4  specifically considered the Crisis/Adult Initial Assessment performed by Dr.

5  Popok, citing to Exhibit 12F/8.  (*Id.* at 22, 288-92.)  Furthermore, the ALJ referred

6  to Exhibits 22F and 25F, which encompass Ms. White's diagnosis.  (*Id.* at 22, 372,

7  376.)  Although the ALJ does not explicitly mention the opinion of Dr. Ramin, the

8  ALJ noted Dr. Ramin's diagnosis of depression, stating that Plaintiff had

9  "treatment for major depression and panic disorder closely intertwined with

10  exacerbations of polysubstance abuse."  (*Id.* at 22, 304, 335.)  As such, the Court

11  cannot find that the ALJ failed to properly consider the opinions of the treating

12  source physicians.

13                b.   Newly Submitted Evidence

14       As to the Newly Submitted Evidence, Plaintiff claims that the new

15  information should be credited and the case should be remanded for further

16  consideration.  (JS at 23.)  In the Ninth Circuit, where a claimant has submitted

17  additional materials to the Appeals Council in requesting review of the ALJ's

18  decision, the district court may consider the new evidence "because the Appeals

19  Council addressed them in the context of denying [the claimant's] request for

20  review."  *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) (*citing Ramirez v.*

21  *Shalala*, 8 F.3d 1449 (9th Cir. 1993)).

22       Here, the Newly Submitted Evidence was considered and addressed by the

23  Appeals Council in the "Notice of Appeals Council Action" issued on October 6,

24  2006.  (AR at 6-10.)  In denying Plaintiff's request for review, the Appeals Council

25  found that the Newly Submitted Evidence "does not provide a basis for changing

26  the [ALJ's] decision."  ( *Id.* at 7.)  Because the Appeals Council specifically

27  addressed the Newly Submitted Evidence in denying Plaintiff's request for review,

28  this Court may review the Newly Submitted Evidence.  *See Harmon*, 211 F.3d at

1 | 1180; *Ramirez*, 8 F.3d at 1452.

2    After review of the Newly Submitted Evidence, the Court finds that the case
3 shall not be remanded.  The AR, which the ALJ thoroughly reviewed, was replete
4 with numerous psychiatric examinations and diagnoses, which contain the same or
5 similar conditions as set forth in the Newly Submitted Evidence.  (*See*, *e.g.*, AR at
6 157-62, 163-65, 175-87, 212-16, 288-92, 300-04, 335, 349, 372.)  The Newly
7 Submitted Evidence is at best cumulative of the reports which are already part of
8 the record.  (*See*, *e.g.*, AR at 395, 397, 421-23, 424-26, 479-80, 597-98, 757-59,
9 857, 883-84, 885-86.)  Thus, the "new" evidence does not qualify as material or
10 probative, and is not considered sufficient for remand.

11    Accordingly, the ALJ properly considered the treating source opinion, and
12 the case will not be remanded for the ALJ to consider the Newly Submitted
13 Evidence.

### ORDER

    IT THEREFORE IS ORDERED that Judgment be entered affirming the
decision of Defendant, the Commissioner of Social Security, and dismissing this
action with prejudice.

DATED: May 2, 2008

HONORABLE JOHN C. RAYBURN JR.
UNITED STATES MAGISTRATE JUDGE

19